May it please the Court, my name is John Fletter. I'm here as counsel for the appellants, APMR and BRMR Neurotech. I'm accompanied here today by my co-counsel, Paul Chan. Basically I guess there are four issues that we've raised in this appeal and I'd like to focus briefly on two of them, probably not address a third and devote most of my time to the fourth argument. The first issue is whether we have competitive standing. Do you have to have competitive standing with each of the defendants or can you have competitive standing with one of the defendants and it carries over to the others? We need to be competing or have competitive injury as a result of the activities of the defendants collectively. The lower court applied a test that has not been adopted by any court which is that the plaintiff in order to sue under the Lanham Act has to endeavor to perform the same functions and that has never been the test in this court. The test focuses on the injury suffered by the plaintiff and whether it is part of The defendants collectively were selling a product. They each had different functions admittedly, but under the case law that's a distinction without a difference. There simply is no dispute that the products in question, the plaintiff's product, the Slendertone Flex, and the defendant's product, the Aptronic, were in The Slendertone Inc. is not a plaintiff in the case. That's correct, Your Honor. They're not a defendant either. I mean, they're not a party to the case. That's correct. But as we've noted, BMR Neurotech did sell the product through QVC and has had sales and obviously lost money as a result of the defendant's illegal conduct. The issue is, were these products competing? And with one very glaring exception that I want to get to, they obviously were. They were both products that were electrical muscle stimulating devices. They were both being sold in the United States. They were both being sold to consumers. The distinction is, one of the two products was legal and one of them was patently illegal. But that doesn't diminish the fact that these products were being sold in competition with each other, in one case by our plaintiff and the other case by the defendants collectively. Well, one of the things they say is that you weren't selling the products, that none of the plaintiff corporations, in fact, were selling the products. I gather you say that you did sell some products for a short while. We did sell some products for a short while. BMR Neurotech, the record is beyond dispute on that except that in the findings of fact and conclusions of law that were adopted verbatim by the lower court, the lower court disregarded the declaration that we had submitted to the court showing very clearly that BMR Neurotech had sold products. Yes, it was very difficult for BMR, BMR Neurotech or Slender Tone Inc. to continue to sell products and the reason is very clear. That the defendants' illegal activity, their gross claims had ruined the market. There were all sorts of news articles, and this is in the record, there were all sorts of news articles and news stories about how these wild claims had been made by these companies about their products. And as a result, the market for this kind of product dried up. That's a very unusual sort of injury to competition and I don't know whether there's any case law on it. No one is contesting that as a viable theory, but it's an odd one because ordinarily when you think of a competitive injury, the competitive injury is somebody is getting a one-up on you because of something it's doing and it's false advertising, for example, and you're essentially saying, well, no, that isn't really it. It's not that he's winning the competition because of it, it's that you're both losing. Well, they didn't lose because they got their products out on the market and were selling them before the media, before the Federal Trade Commission was able to do something to stop it along with, as we've noted, the fact that we eventually got in our litigation an agreement from them that they were not going to sell the product anymore. But in the meantime, they had made millions and millions of dollars because they did what our client didn't do. They put this product out on the market with claims that they had no right to make without going through the required legal process as opposed to what our client did, which is we went through the FDA clearance process, we made the claims that we were allowed to make by the FDA, and by the time the FDA cleared that product, the damage had largely been done. So your theory is not that any of the defendants disparaged your product as a product or sought to drive you from the market. Your contention is that they were such crooks and such fools that they, in effect, soured the market for you. Is that your theory? I'm not sure I would agree with the fool part, Your Honor. They did it very well. But I certainly would adopt your characterization of them as crooks. They put these products out on the market in a mass marketing effort, thumbing their nose at the legal requirements that prohibited them from entering this market and selling the product with the claims that they were making. So your theory then is that any person who sells a demonstrably defective vehicle is liable under the Latham Act to anyone who sells a demonstrably qualified vehicle simply because the first group soured the market or created guilt by association? Is that your theory? Judge Singleton, no. We wouldn't take the theory that far. Our theory is that, in this case, the defendants made representations in their advertising that were, by anybody's standards, false and misleading. But not false about your client. That's correct. And forgive me for not responding to that point. As far as I know, and there's certainly nothing in the record, none of the defendants ever made any public comments about our client or its product in order to gain sales. What they were doing was making affirmative misrepresentations about their own products. And what I think is true... Have you found any case in which a Latham Act claim has been sustained on a similar theory? Yes, certainly the Alfarma case, which we cite in our reply brief, goes that far. The Mutual case certainly goes that far. These are two that we put in the reply brief because they were decided after the earlier brief. How are they that far, meaning on this sort of market destruction theory? On the grounds that what they did is they allowed the plaintiff to go forward with a theory that the products that were being sold by the defendant were being sold illegally because... That's different. I mean, that's different because, in other words, your theory is not that, as I said before, that because they were making misrepresentations about their legality, they got more of the market share than they should have and you got less. Your theory is essentially that because of that and because it was later found out, the whole endeavor of selling these kinds of products was soured, including yours. Well, I think, Your Honor, it's both. I mean, you don't necessarily need to get at the first point because our argument is certainly that you never should have had to look at the claims that were made and whether they were false and misleading and the extent to which it took away from our client sales because they never had a legal right to make the claims in the first place. But on top of that, there is no question that we presented evidence to the district court that the claims that were being made by the defendants were false and were misleading and that if a consumer is seeing an EMS device that's just going to exercise the muscle and is going to see one on television that's going to say you don't have to exercise and you can lose weight on top of it and it's half the price of the one that's been approved by the FDA, I don't think we're going to have much trouble presenting a trial if we get back there that our clients were actually injured. I have a strange question, which is a lot of the problem here, just structurally, is because the splinter tongue company is not a plaintiff. It would be, I mean, you don't need to tell me why they're not a plaintiff, but it does seem odd that it could all be fixed. A lot of it could be fixed pretty simply it appears in terms of this notion of not having the right entity in here if that entity was simply added. Well, Your Honor, I think there's several answers to that. First of all, as I said, there were appreciable sales made by one of the named plaintiffs and I'm not aware of any case that says that if you just make some sales, that that means that it's not enough for you to have standing. The de minimis sales argument that the defendants have made that I guess they say Judge Schreel has adopted, although it's not crystal clear from the record, is one that has no foundation in any of the case law. So, certainly there's adequate record that BMR Neurotech did itself make sales. Secondly, there was plenty of evidence in the record about the direct effect on BMR Corporation, the parent corporation, both in terms of the way it kept its books and other things, about their direct involvement in the marketing of the product and also the impact that occurred to them, not indirectly, but directly to them as a result of the illegal activity. But the third thing is that, as we said in our brief, if there was any question, and we don't think that there was, but if there's any question about the proper plaintiff here, then the proper step for the court below to have taken would have been to give us the opportunity to add Slender Tone Inc. as a... Did you ever ask to? We didn't because of the timing of all this. And I think that's one thing I really want to emphasize. If you look at the record in this case, it was a very frustrating six to seven months for our client. We couldn't take depositions because of a lack of cooperation. People weren't showing up for depositions. They weren't timely responding to interrogatories in terms of providing what we were entitled to. And we were given a very... Both sides were given a very short trial deadline. So what was the trial deadline as compared to when the summary judgment issued? The trial was going to begin... The case was filed in February, and the judge at that time, when he granted summary judgment, had set trial for early December. And what was happening is, in the month of October... And was there a discovery cutoff? No. There was no discovery. And as we said, the defendants not only hadn't had some of the defendants appear for depositions, they were sanctioned for it. Some of the depositions were going to be occurring after summary judgment was granted, but they hadn't even made their Rule 16 disclosures. And there was a pending motion to compel that the court never even addressed. And what happened here, I think, if you just look at the calendar sheet, is there was quite a bit of activity, largely by the defendants, in terms of the summary judgment motion. And it was filed on October 21, 2002. I'm sorry, October 15, 2002. And because of the local rules, my colleague, Mr. Chan, had six days to respond to that motion for summary judgment. Now, I don't want to say that to suggest that he didn't do a good job, but there was enough activity that in six days it was, frankly, fairly difficult for us to deal with all of the discovery motions that we were filing, responding to the summary judgment, and worrying about whether we needed another plaintiff, particularly when we had a plaintiff. We had a plaintiff who had made sales. Did Judge Reel ever respond directly to the 56F motion? He didn't respond directly or indirectly. He never talked about it. It isn't in any rulings. He didn't address the affidavits that were filed by Mr. Chan and our client. We specifically disputed facts and cited to declarations, and Judge Reel simply signed the statement of facts that had been presented to him by the defendants' counsel. The oral argument, as we said, on the motions for summary judgment was seven pages of transcript. There was no argument, and the judge just simply said that he was granting the summary judgment motion. Counsel, you may be planning to get to this at a different point, and by all means structure your argument as you wish to. But if you weren't, I'm concerned about one of the issues, and that has to do with the decision not to make the FDA claims private causes of action. In other words, that the U.S. Supreme Court has held that a person complaining of an FDA violation does not have a private cause of action. Your response, as I understand it, is there is a separate California statute that purports to give victims of economic loss a private cause of action where any regulation statute, federal, state, local, or municipal, has been violated. Is it your understanding that the California statute is that broad and that it essentially subsumes all the U.S. Supreme Court cases that say no private causes of action for violation of federal statute? I believe so, but I would, Judge Singleton, after I answer this, like to get back to what our argument is because I've actually had a chance to think about this a little bit more since our briefs were written. The California statute, section 17-200, has a prong called unlawful. And the courts, I think, have universally interpreted that prong as saying that if something is unlawful under federal law or under state law. Is that unlawful competition? Excuse me? Is that unlawful competition? No, it's an unlawful practice. But let me, if I can, now turn to what you said. And I have a great desire to refine our argument a little bit, in part to talk about what we're not arguing here. The case that you're referring to, Buckman, says that private parties can't privately enforce the Food, Drug, and Cosmetic Act. I was with the Justice Department. I know what public enforcement of the Food, Drug, and Cosmetic Act is. You go into court, you seek a seizure, you seek an injunction, or you do as we used to do, you bring a criminal case. That is enforcing the Food, Drug, and Cosmetic Act. What has happened over the years in the Lanham Act context and in other areas, is that people have said, when they use the term private enforcement, you can't really interpret the Food, Drug, and Cosmetic Act in the context of another statute. Say, for a moment, we'll deal with it in a second, the Lanham Act. Buckman dealt with something particularly unique to the FDA, and that is fraud on the FDA. Let me, if I can, just point the court to what I think are three very clear different situations. Situation number one is where the Food and Drug Administration has not spoken on an issue. In that sense, if a litigant went into court under the Lanham Act and asked the Lanham Act court to interpret the Food, Drug, and Cosmetic Act, then using the words that were used in Buckman and some of the other cases, I think it would be very clear that that would be a private enforcement or a private interpretation of the Food, Drug, and Cosmetic Act and be absolutely improper. The second situation is where a lower-level employee in the FDA writes a letter and says, you are violating the Food, Drug, and Cosmetic Act. This happens a lot. FDA generally regulates not through court cases but through letters to companies. And in those situations, under the rules and under a lot of the cases, the person getting that letter has an appeal right and oftentimes will appeal and will say to the FDA, no, I think you're wrong.  If a litigant went into court and asked the court to interpret the Food, Drug, and Cosmetic Act when the matter is under review by the FDA, we would submit that that, again, is a private enforcement of the act or interpretation. Your 17200 allegation is extremely general in faith. I guess I would have guessed, and I think I guessed wrong, that it was meant to parallel the Lanham Act allegation. And as I understand the Lanham Act allegation, it's the misrepresentation, false statements that you're focusing on, the false statements and the omissions. The indication, at least by omission, that this is a lawful product and so on and that the claims are valid and so on. And that the FDA action is simply a backdrop to that, as I was understanding it, almost evidence that this is false. Is my understanding of the Lanham Act version correct? I believe so, Your Honor. All right. So is your 17200 claim different? Is your 17200 claim an actual allegation of the illegality of the product substantively rather than focusing on the misrepresentations that were made in the various advertisements? Only in one distinction. Is there one distinction? In the 17200 claim, there is a specific prong that deals with something being unlawful. I understand that. So you are saying, therefore, that your 17200 claim deals with the unlawfulness under the FDA rather than with the misrepresentation? No, both. Both. But there is a specific allowance for making a claim in a 17200 case that something is unlawful. In this case, though, we are suggesting very strongly that it is absolutely appropriate for us to bring before the court and we have to, the district court, and we do have to say that this is just on the pleadings that this case was dismissed, that the defendant's product was illegal. And it is very important that it does go before the court. And I'll explain in just a minute. Except your time is up. So why don't we give you another minute or two to wrap up and then we'll give you a minute or two in rebuttal. What we have here, Your Honor, is a very clear situation where the government has definitively spoken. They've spoken first through the warning letter to Smart Inventions and others that the product was illegal. Second, through from what the record indicates, no objection being made. And third, to a paper filed in the district court by the Federal Trade Commission where they rely on what they say is an FDA determination. There is no case that has those unique set of facts. We wouldn't have to have all of them to go that far. But in this case where we have all of those facts, we are not privately enforcing the Food, Drug, and Cosmetic Act. We are not stepping in FDA's shoes. And I want to add just one. I'm having a hard time seeing why that's so if under the California 17-200, the only element for at least part of your case, not the other part, is that it was unlawful under the FDA. Because that's what you're telling me. What I'm telling you is that one part of our 17-200 claim is that the, using the specific word in 17-200 about unlawful, that it violated the Food, Drug, and Cosmetic Act. Right. There are other aspects of our 17-200 claim. Such as? That somebody was injured by this? I don't remember the exact wording. But basically it ties to the same kinds of false, misleading, unfair. No, I understand that. But a piece of it is a direct unlawfulness claim. And that seems problematic to me. Because presumably you couldn't file it. We know that you couldn't file a case under the FDA saying this is correct. That's correct. And this version of the 17-200 claim doesn't seem to have any added element. It's simply the state saying, well, as far as we're concerned, you can file a private cause of action under the FDA. What's different about that? The case law has said, the Watson case, which is a district court case, and others have said that you can, in looking at whether something was unlawful under 17-200, look at whether there is a federal law regulation that's been violated. But not if that law doesn't let you do it. That's the problem. In other words, if the federal law doesn't permit private causes of action to enforce it directly, as opposed to in this more indirect misrepresentation fashion, or a per se negligence fashion or something like that, where the state cause of action has other elements. But here it has no other element. Well, Your Honor, I think that the cases do say, how Pharma says it, Mutual says it, there's a common thread in all of these cases, that where the FDA has definitively ruled on something, the plaintiff who is trying to go forward and carry out that interpretation is not privately enforced in the Food, Drug, and Cosmetic Act. But let me just explain how I think this works, and then I'm going to sit down. If... Yes, you are. Okay. If we are wrong on this, then the effect is we go into district court, if this court reverses, we go into district court and have to show that the claims made by the defendants were illegal, false and misleading. Right. That is a determination that under federal law is not really supposed to be made by the Lanham Act court. It's a determination that is supposed to be made by the Food and Drug Administration in the first instance. And so for us to have to go into a Lanham Act court and prove that the statements are false and misleading is really to deprive the FDA of their primary jurisdiction. Except they've already, as you point out, you're simply relying on false and misleading statements about what the FDA has already done. That is exactly right. And so that is exactly why we should have the right to go into federal court. And I don't have a problem with that, but I have a problem with the notion that you can do it directly. Well... Without the false and misleading statements, and that's what you're suggesting about 17200. I think we can do it without the false and misleading statements. In this case, we wouldn't have to because we could obviously prove that they were false and misleading. My point is that as a matter of law, these are claims that these people had no legal right to be making. Okay. And FDA is so determined. I think you should sit down. In fact, you should sit down. And we will give you a minute or two in rebuttal. Thank you. Thank you very much for a helpful argument. Good afternoon, Your Honors. My name is Steve Mick, and I am here on behalf of defendants and appellees, Smart Inventions, Smart Living, TV Products Fulfillment, and John Noakes. Could I ask you a question just about that? Yes. Are you here representing Thane International Inc. and the Thane companies? I am not. There were 14 defendants below. I am here representing only four today. Now, there are some others that apparently were not dismissed that may or may not have filed notices of appeal and don't seem to have filed briefs and aren't represented. That is correct. Who are they and what do we do with them? The defendants in question are Bismarck Labs and its president, Bernd Ebert, Hudson Berkeley, and its president, Matthias Granick. Bismarck Labs was the United States distributor for the manufacturer of Abtronic. It was based in Cathedral City where Mr. Ebert lived. Hudson Berkeley was the marketing company that contracted for all of the advertising for this product. They are not here because they are unrepresented and, as far as I know, have filed no briefs or taken any participatory act. They did file a notice of appeal with prior counsel that then withdrew. Is that basically what happened? I wasn't aware that there was a notice of appeal. They were entirely successful below. There would be no grounds for them to appeal. Oh, I'm sorry. You're right. But they were appealed against. What about the Thane Group? The Thane Group, I believe the claims against the six defendants who were associated in some way with Thane International were settled out after the entry of judgment, perhaps even after the entry of the notice of appeal. I cannot recall the precise timing. Okay. Counsel for the plaintiffs has indicated that his primary theory is that by marketing Abtronics, the market was chilled for their competing product. What did your defendants, the Smart Group, do with regard to marketing the Abtronic? Thank you, Your Honor. That is exactly the right question. The answer is nothing. My clients did not have anything to do with the production of the infomercial that consumes the bulk of what is at issue here. They had nothing to do with the airing of the infomercial. They had no control over it. They had no participation in it. They didn't touch any of it. Well, let me ask you something. My clients Is it true that your clients did not appear for depositions and or walked out of them? It is true that my client, John Noakes, appeared for his deposition. His deposition was suspended pursuant to Rule 26 and Rule 30 in order to seek a protective order with respect to a question dealing with financial information unrelated to the matters in this case. That issue was presented to Judge Reel, and there was a subsequent order that it resumed. There is, in the record here, correspondence between counsel where you can see that the suspension of the deposition was wholly limited to that particular issue. At any rate, that deposition was never finished. Some others which were noticed never occurred. That is true. At least part of what is being said here is you say you had nothing to do with the infomercial, but how were they supposed to know that if they never got discovery? They did, in fact, take the deposition of the producer of the infomercial. They did, in fact, take the deposition of the woman who was part of the creation of both the infomercial and the product herself, Susan Leslie. They took the deposition of Leanne Johnson, who was responsible for all of the marketing and the broadcasting of the infomercial. They obtained voluminous document discovery, both in this action and in ancillary actions. They received written discovery responses. The role of all of my clients was clear from that record, so clear that the role is fairly accurately described in their own First Amendment complaint. What about the information that you were a master representative for procuring orders from stores, etc., so that you had some significant sales role? That is an accurate statement with respect to smart living. It may have had to be tangentially accurate with respect to smart inventions. Stores like Bed Bath & Beyond and Walgreens, which wished to order the product, would order it through those companies. They were what is called in the business a retail representative. They would take those orders, relay it through to the manufacturer, and ship the product out to retail stores. TV product fulfillment's role, a separate defendant here, was to package and ship the products that were ordered on television. They were literally a shipper of this product. TV product fulfillment is indifferent to what they put in the boxes. If Mr. Fletcher's clients had called them up and said, would you package and ship our products, they would have said, absolutely. They would have been gloriously happy for the business. Well, PMR's theory is that you were doing marketing and sales, and that you, along with the other defendants, I guess some of who are no longer before us, were therefore competitors, broadly speaking. I think that is incorrect both factually, and it's incorrect with respect to the notion of what it means to be broadly speaking, because I don't believe that the precedent of this court establishes that broadly speaking counts. If broadly speaking was enough, Jack Russell Terrier would have been decided in the other direction. Why is that? It seemed to me that in general, the difference in the case law was between a sort of horizontal relationship and a vertical relationship, very generally put. In Jack Russell Terrier, as I recall, the dispute was with the vertical, i.e., the entity with which they were affiliated, and that's who they were suing for expelling them or something. It wasn't with another subgroup of the umbrella organization. Am I accurate, first of all, about the case? My recollection, Your Honor, is that in Jack Russell Terrier, the plaintiffs were asserting that a terrier breeding organization had engaged in misrepresentations relevant to the status of Jack Russell Terriers. They were individual breeders who were affected directly, they claimed, and I think the court accepted it for purposes of the decision, by the misrepresentation because it impacted the value of the terriers that they were associated with, but they were in the wrong place in the chain. The horizontal competitor with the defendant in that case was, I believe, the American Kennel Club, and there's a little discussion in the opinion about the fact that the plaintiffs were wistful, that they didn't have the right defendant in there. They didn't have the horizontal party in there as the plaintiff, and the decision by the Ninth Circuit in that case was that's not our problem. Jack Russell Terrier states, I think, a very clear conception of what the competitive injury requirement is, and I'm going to quote it because I think the way in which it is presented is important here. It says, and I quote, Plaintiff must show one, a commercial injury based upon a misrepresentation about a product, and two, that the injury is competitive or harmful to the plaintiff's ability to compete with the defendant. The problem that we have here is that BMR and Neurotech's assertion is all about prong one of Jack Russell Terrier. You see, the main plaintiff in Jack Russell Terrier was Jack Russell Terrier Network of Northern California, and Jack Russell Terrier Networks of Northern California's problem, as I understood it, was that they were formerly an affiliate of the, whatever the other organization is, the Jack Russell Terrier, whatever, and that, so they were sort of hierarchical, and that they were expelled from that relationship. It was like a, you know, a buyer, a retailer saying, I'm not going to buy from you anymore, and that was a noncompetitive injury because they were at different levels of the same chain. Essentially, it was a vertical problem. Is that not accurate? I believe it is, but I believe that there are other plaintiffs in the case. I believe there were two individual plaintiffs, Claudia Sprague and Georgia Fisher, and that the resolution of the individual plaintiff's claim is more akin to where you are from a horizontal standpoint. But I think that to go directly to the question of what it means to be harmful to the plaintiff's ability to compete with the defendant, I think that the court's assessment that the competitive injury requirement here is rooted in the notion of direct competition between the parties is accurate. The policy of the Lanham Act and the basis for all of the competitive standing cases and decisions is that the purpose of Lanham Act standing is to deal with situations where one party is elbowing aside the other party in order to obtain its business. Your real problem, the way you describe your clients' roles, is essentially that your clients did no wrong in a Lanham Act sense, but you didn't make the misrepresentations. And if that's true, then you will win down the line, right? That is true, but it doesn't go as far as the issue here before us. The issue here before us is whether, from a Lanham Act standpoint, a party has the ability to sue everyone up and down the chain, from the original manufacturer down to the region. My observation is that you profited. You competed through the misrepresentations. Was it not for the misrepresentations? You were in a horizontal relationship with them as to some subset of activities and that because of the misrepresentations, you profited and they didn't profit. That seems to me not to be a standing problem. It may be a substantive problem. People just weren't responsible for making the misrepresentations. But in terms of the injury, it seems to be a competitive injury. It is, I believe, an injury that satisfies the first prong of Jack Russell but not the second because it does not in any way harm biomedical research, the Irish manufacturer's ability to compete with TV products, a company that packages stuff in boxes and puts stamps on them. The reason it doesn't harm is because those two companies are not in any way competing against each other. They are indifferent to each other's activity. Wasn't that the question for which they wanted to have the depositions, which was to explore the full nature of what all these entities were doing? To be honest, I assume that they wanted to have depositions because they wanted to depose all of the defendants. They don't actually specify in their papers the specific information that they were seeking. But how did they know that you're not doing these misrepresentations and competing unless they have had an opportunity to do appropriate discovery? Again, the difference is between having the opportunity to do all of your discovery and having an opportunity to do enough to understand what was going on. If the gap here is meaningful, you should be able to say, what I need to prove here is X or Y. What fact I want to demonstrate is Z. Judge Riehl, as we know, generally has a habit of not explaining himself. But in this instance, he just didn't respond to the 56-F motion in any respect at all. Is that correct? That is accurate. The case law of this circuit, I believe, indicates that he is presumed to have denied it, and it is viewed in the normal manner, which is to say that his judgment with respect to that matter is upheld if it is correct on any ground on the record. The issue here, as we pointed out in our briefs, is whether or not, well, there's two issues. The specific issue with respect to 56-F is whether or not the plaintiffs have identified specific information that would change the issues here. And the second issue is they can't, because none of the issues that they're talking about would change the fact that biomedical research, the Irish manufacturer, is an entity whose status is known, and TV product fulfillment is an entity that's far away in the competitive situation and chain. Biomedical research concedes that it does not sell this product in the United States, that it did not market the product in the United States itself, but only through its subsidiaries. Indeed, a very interesting admission appears on the face of its complaint in paragraph 9, which you'll find on page 59 of the record, that biomedical research, the Irish manufacturer, is not even qualified to do business here. When a foreign manufacturer makes a choice, when it says, I'm not even going to qualify to do business in the United States, all of my activities are going to be through this subsidiary over here. There is a declaration saying that it did sell some products. There is a declaration that says somebody sold some products, but as we've made clear in the briefs, we object strenuously to the notion that they can shuffle the identity of the parties whenever it is convenient to them. Their declaration is chalk filled with conjunctive references. The actual documents and actual facts indicate that Neurotech, the subsidiary based in Arizona, sold a small number of products for about one month. All right, so they sold products. So then you have a problem as to when the parties is in here, but that doesn't get rid of the case. It, I think that, Your Honor, it gets rid of the case with respect to biomedical research, the Irish manufacturer, a party that does not, that makes a purposeful decision not to come into the United States, has no business within the meaning of competitive harm in the Lanham Act. Well, if it's competitive, I mean that's one sort of vagueness in the case law, which is all a gloss on the statute. It's not in the statute. And they're talking about competitive injury, not competitors directly. If biomedical research owns these other two companies and because of what you're doing they're making less money, why isn't that competitive injury? Because this Court has held in an unbroken line of precedent for 30 years that parent corporations don't have standing to sue for injuries that are happening to their subsidiaries. But that depends what the injury is. If the definition of this injury is competitive injury, which means is the way you're competing hurting us, and the way you're competing is hurting them by decreasing the profit that they're earning through their subsidiaries, why isn't that a competitive injury? Because it's not harmful to the manufacturer's ability to compete with my clients because the manufacturer is not trying to compete with their products. They are alleging Jack Russell prong one and they are pretending that it is Jack Russell prong two. As far as I can tell, and you can tell me if I'm wrong, none of the cases about competitive injury deal with interrelated companies, wholly owned subsidiaries or anything like that. Am I right about that? I think that is accurate. Although obviously the separate line of case law with respect to parent subsidiaries. I understand, but as to what competitive injury means and how that plays out in the instance of a set of vertically related wholly owned subsidiaries where the parent company has a great deal of control over the lower companies. I mean, there's a difference between saying they're suing for the injury to the lower company and saying they're suing to the injury to them, to their pocketbook from your activities. I agree, Your Honor, but the point in parent subsidiary standing is to try to identify who the correct party should be in front of the court. That depends what the substantive standard is. In other words, we have here a standard which is sort of manufactured out of whole cloth. It's not in the statute that says that there has to be a competitive injury, and the question is what does that mean in this context which no case actually addresses? I concur that there is a gap in vagueness there, Your Honor. I think that it is significant that this is a case where we actually know who the right plaintiff should have been. It should have been Slenderton. All right. What about the question? What about just sending it back to amend the complaint to put him in? Your Honor, as Mr. Flutter concedes, they've never asked to amend to add Slenderton. But that's never been our standard. Our standard has always been that they're supposed to be leaved to amend in this reversible error theory. Unless it's futile. You're acknowledging it. It's not futile. I actually beg to differ, Your Honor. I think the standard in the Ninth Circuit is you have to ask. I think in brains pasta, Bella versus Visa, 442, F3rd, 741, and Alaska versus the United States, 201, F3rd, 1154, the Ninth Circuit has clearly held that you have to ask, that raising it at the point of argument on appeal is too late. So they should have brought a motion to reconsider? They should have just simply said if the issue here, Judge Reel, is that Slenderton distribution is the right party, let us bring the claim on behalf of them. That's all that they needed to do. And certainly Slenderton distribution would have had standing against some defendants. I don't concede that it would have necessarily been the party that boxes and ships things in the mail, because in response to Your Honor's question earlier, I think the way in which the Jack Russell prong is written indicates that your injury must be competitive as to each of the people you're suing. If you are suing and saying, I've been injured, I'm going to claim damages against you, Jack Russell and the supporting cases say that that injury must be competitive as to the person you're going to take on. And Coastal is sort of different than that, right? Excuse me? The Coastal case is different, because there the officer of the corporation could be sued, even though he obviously was not the company competing. I think Coastal fits into the line of vicarious liability. There's a separate line of authority with respect to what you have to plead and prove in order to hold an officer liable for the corporate acts. Coastal says that he's an officer. For officer liability, you have to show that he directed, authorized, or participated in. And this is a very important point that I would like to raise. John Noakes is an individual defendant who is one of my clients and is here before us. Mr. Noakes, in his 12C motion, objected and moved to dismiss on the grounds that the Coastal standard, direction, authorized, and participate, had not been pled or proven in this case as to him. He got an order granting his 12C motion to dismiss for failure to allege that he participated in any way in the activities. That order is entitled to be affirmed if it is correct on any ground. And here, Mr. Noakes' 12C motion to dismiss for failure to allege or prove that he participated was not appealed from in any way. It is not mentioned in the briefs. It is not mentioned anywhere. It has absolutely been waived. And he is entitled to have the dismissal as to him affirmed, simply because there has not been the slightest effort to preserve that motion. In your argument, you've identified a number of related companies, the smart group. Yes, that's correct. And one of them, you've emphasized, did nothing but package. Yes. What did the others do? The other two are essentially retail representatives. They take and process orders from retail stores. They relay those orders to the manufacturer. The manufacturer ships boxes into the port in Long Beach, and they point so that the boxes go out to the Walgreens and the Bed Baths and Beyonds of the world. In those aspects of the complaint that referred to smart group, is there any allegation that any representative of any of the smart group made any misrepresentations or false statements about anything? Your question is directed to the allegations in the complaint. And I'm a little bit of a handicap here, because none of the briefing addresses the allegations in the complaint. They essentially brush aside the whole 12C order in a fashion that is somewhat cavalier, it strikes me. My recollection is that they indicate that my client shipped boxes and that the boxes contained statements that they are objecting to. I would like to note that we think with respect to the 12C waiver on, with respect to smart inventions and smart living, that we think that the case of USV comma 394F third 1236, a 2005 decision of this court, is directly on point. There, the court dealt with the question of a waiver of an alternative ground where the party that had waived somewhat cavalierly suggested that it shouldn't be enforced against it. And the court indicated that while there are circumstances in which a waiver will not be enforced, the party who has failed to raise an issue in its briefs has the burden of coming forward and explaining that some exception to the general rule of waiver applies. Let me see if I can understand what you're talking about now. There was a 12C motion and there were also motions for summary judgment. That is correct. With regard to notes, I understand they were on different grounds, substantive grounds. With respect to the others, were they on different substantive grounds? No. It was a failure to plead standard. All right. So in the meanwhile, there was material introduced into the record, and why at that point isn't the 12C essentially superseded by the motion for summary judgment? Because the 12C motion for judgment on the pleadings is a separate challenge based upon whether you have alleged that you satisfy the standards. But the rules provide that if you introduce evidence in association with, for example, a 12B, and this is parallel, a 12B6, that the judge can then convert it into a summary judgment motion. Why isn't it essentially what happened here? He can, but that's not what happened here. He signed a separate order. Treating it as though it was only the summary judgment turns the standard and burden on its head. The burden that is, I believe, the law of the circuit is that the order and judgment are presumed correct if they are correct on any ground. What the plaintiffs ask you to do is to say, please resolve the issue of alternative grounds completely in our favor without regard to this other one, when I think the law is in fact that the court is required and supposed to say, look, there's an alternative ground on the record here that you failed to plead, and you didn't do anything with respect to that. You don't bring our attention to any of the pleadings. You don't draw and indicate why the pleadings in the complaint are correct. What was the time sequence of these? Logically speaking, if they were dismissed on 12C grounds, they never should have been a summary judgment motion. They were brought as alternative motions and heard on the same day. The orders are entered on slightly different days, perhaps, but they were granted on the same day. One last point I would like to make, and that is with respect to 17-2 and 17-5. We have about 20 seconds, so go ahead quickly. The 17-2 and 17-5 claims are dead for reasons that are not reflected in the briefs but have to do with what has happened in the ensuing five years. The injunctive claims are moot because this product and its manufacturer have been gone and out of business for five years, and the manufacturer is subject to a permanent injunctive order out of the District of Nevada. So there is no possibility of any continuing controversy with respect to this issue from an injunctive standpoint. The claim for monetary relief under 17-2 and 17-5 does not survive the California Supreme Court's decision in Korea Supply, which is 29 Cal 4th, 1134 for the record, and the ensuing decision in Prop 64, which essentially collapses the ability of a competitor to bring a monetary claim under 17-2 and 17-5. Under Korea Supply and the modern law of California, a monetary claim can only be brought for restitutionary relief, which is to say, I have given you money, I want the money back. That's not their claim. Under Korea Supply, they have no claim, so this claim, the California claims under 17-2 and 17-5 would die. But it wasn't briefed. And I suppose if we sent the case back, we could worry about that. I mean, it could be worried about that. Obviously, it was not briefed, Your Honor. The decision is post-briefing in this case. I'm sure you have a view. That doesn't matter. We entertain 20HA motions all the time. Thank you very much. I promise I won't be brief. All right. Very brief. Two minutes. Mr. Noakes was deposed for seven minutes when his counsel, Mr. Mick, terminated the deposition. What about the notion that he, aside from the other 12C issues, that he was dismissed on 12C grounds for a separate reason and that that should survive? Well, actually, Your Honor, under Rule 12C, it isn't that the court may convert it into Rule 56. It is that it is automatically converted into a Rule 56 motion. Isn't that only if the court considers? It's not if the party puts it in. If the court considers. Judge Singleton, I don't have the rule sitting right in front of me, but I think the rule says that if outside materials are submitted as part of a 12C motion, then the motion is automatically converted into a Rule 56 motion. And, indeed, what happened here is that there was information submitted as part of that series of motions that the defendants filed where the lower court just signed the orders proposed. It did reference Mr. Noakes and his activity. And it's particularly troubling that in this case where we tried to depose Mr. Noakes, and the question that Mr. Mick would not allow to be answered is, what other businesses, other than the three businesses that you've identified in your businesses, did you have any affiliation with? So I don't know whether he had any affiliation with Hudson Berkeley or some of the other companies. Maybe he did and maybe he didn't, but we will not know on the basis of this record. Can you tell us quickly what your understanding is about the status of Hudson Berkeley and the other company and their owners having not appeared? I don't know that there is a Hudson Berkeley or a Bismarck anymore. As far as I know, Mr. Greenish and Mr. Eber are still alive. I don't know where they are. But I think that with all of the other reasons that we have stated, the appeal should result in the ---- But if we thought it mattered to know something about who they are and how they relate to the various activities, we have no idea. Well, I don't know that it was really disputed. I mean, certainly Mr. Ebert was very, very heavily involved in the advertisement that is primarily at issue. And I believe Mr. Greenish was too. I mean, we never got to depose them because they refused to show up and Judge Reel had ordered them to testify.  Thank you very much. Thank you. I thank counsel for a very useful argument and a hard interview.
judges: Berzon, Ikuta Singleton